

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EWS/ADG
F. #2022R00718

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 20, 2026

By ECF

The Honorable Diane Gujarati
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. John Bolden
             Criminal Docket No. 24-361 (DG)

Dear Judge Gujarati:

The government respectfully submits this letter in advance of defendant John Bolden's sentencing hearing, which is scheduled for June 3, 2026, and in response to the defendant's sentencing memorandum filed on May 14, 2026 (ECF No. 113). For the reasons set forth below, the government respectfully submits that a custodial sentence of 51 to 63 months should be imposed in this case. The government's recommendation is a six-to-eight-month downward variance from the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 57 to 71 months.[1]

I.      Background

A.  The Covid-19 Pandemic and Paycheck Protection Program

On March 13, 2020, the President of the United States issued Proclamation 9994 declaring a national emergency beginning on March 1, 2020, as a result of the spread of COVID-19. On March 27, 2020, the President signed into law the CARES Act, which was designed to provide emergency financial assistance to the millions of Americans who were

---

[1] In the plea agreement between the parties, the government agreed that a six-to-eight-month downward variance from the range of imprisonment ultimately calculated by the Court would be appropriate if certain conditions for a global resolution were met. (Plea Agmt. ¶ 2). Those conditions were satisfied.

suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to an initial $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized over $300 billion in additional PPP funding. (Presentence Investigation Report ("PSR") ¶¶ 14-15).

To obtain a PPP loan, qualifying businesses were required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required recipient businesses, through an authorized representative, to acknowledge the program rules and make certain affirmative certifications to establish eligibility for the PPP loan. For example, in the loan application, recipient businesses, through an authorized representative, were required to state, among other things, their average monthly payroll expenses and number of employees. These figures were used to calculate the amount of money the businesses were eligible to receive under the PPP. The recipient businesses were also required to provide documentation supporting the information contained in the loan application. (*Id.* ¶ 16).

PPP loan proceeds were required to be used by the recipient businesses on certain permissible expenses focused on keeping small businesses afloat and workers employed, such as payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on a PPP loan to be entirely forgiven if the recipient businesses spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain percentage for payroll costs. (*Id.* ¶ 17).

The PPP was overseen by the U.S. Small Business Administration ("SBA"), which had authority over all PPP loans. Individual PPP loans, however, were issued and approved by private lenders, who received and processed PPP loan applications and supporting documentation and, following SBA approval, made loans using the lenders' own funds. (*Id.* ¶ 18).

According to a June 2023 report from the SBA Office of the Inspector General, more than $64 billion in PPP loans were potentially fraudulently acquired through schemes such as the one organized by the defendant. *See* SBA OIG, Covid-19 Pandemic EIDL and PPP Loan Fraud Landscape, June 27, 2023, *available at* https://smallbusiness.house.gov/uploadedfiles/sba_oig_report_23-09.pdf.

B. Bolden's Introduction to the Criminal Conduct

The defendant, a detective in the New York City Police Department ("NYPD"), engaged in wide-spread schemes to defraud the SBA and financial institutions administering PPP loans between May 2020 and October 2022, resulting in an attempted loss of nearly $3 million. In addition to his full-time job as a public official, the defendant worked as a tax preparer and operator of at least three franchise locations for a tax preparation business (the "Tax Business"). The defendant committed the fraudulent schemes by helping more than 65 people—clients, family members, and NYPD co-workers—obtain PPP funds to which they were not entitled. (PSR ¶¶ 7, 19-20). Specifically, the defendant prepared fictitious Internal Revenue Service ("IRS") Form

Schedule C documentation concerning the applicants' employment, gross income, and/or net income. These Schedule C forms, which accompanied the PPP loan applications, included figures that made it possible for the defendant and his clients, family members, and co-conspirators to apply for loan forgiveness without having to submit additional documentation to support the fraudulent figures. (*Id.* ¶ 20).

The idea for the defendant's criminal scheme came from an email he received in May 2020 with an attached recorded lecture given by the founder and operator of the Tax Business ("CC-1"), which recording discussed how to prepare fraudulent PPP loan applications using fictitious Schedule C forms. As detailed in the PSR, CC-1 recommended, among other things, that meeting participants: (1) submit PPP loan applications in amounts near $20,000 to avoid having to submit proof that the money sought was properly used to apply for loan forgiveness; (2) follow a formula to reach that approximate $20,000 amount; and (3) get creative with the fake businesses they come up with for their clients. (*Id.* ¶¶ 21-23).

After receiving this recording, at first, the defendant worked with CC-1 to prepare fictitious Schedule C forms used in the submission of PPP loan applications for himself, NYPD coworkers, co-defendants, and others. For example, on May 11, 2020, CC-1 emailed the defendant a fictitious IRS Form 1040 and fictious Schedule C form in the defendant's name for the 2019 tax year. The Form 1040 falsely reported that the defendant earned $6,866 in wages in 2019, despite NYPD records reflecting that he earned over $200,000. On May 18, 2020, a $20,785 PPP loan application was submitted for the defendant along with the fictitious IRS Form 1040 and Schedule C form received from CC-1. On May 21, 2020, the defendant withdrew $3,000 in cash from his personal bank account, which he paid as a fee to CC-1. On February 20, 2021, the defendant submitted a second draw PPP loan application in the amount of $20,782, which money he received. On July 17, 2021, the defendant submitted an application seeking forgiveness for the defendant's initial PPP loan, which was granted on July 30, 2021. (*See id.* ¶¶ 24-28).

The defendant and CC-1 replicated this fraudulent process for multiple people in exchange for between approximately $3,000 and $4,000 in what an individual ultimately fraudulently received in loan funds. These individuals included co-defendant and NYPD Detective Anthony Carreira, Carreira's spouse, NYPD Lieutenant Roberto DelaPena, DelaPena's spouse, the defendant's mother Jacqueline Johnson, and the defendant's cousin and co-defendant Christian McKenzie. In each case, CC-1 and the defendant provided fictitious tax documents to the defendant's family members and colleagues, often in exchange for a portion of the fraudulently received funds. (*See id.* ¶¶ 29-45).

C. Bolden's Own PPP Loan Fraud Scheme

At a certain point in the summer of 2020, the defendant began his own scheme, apart from CC-1, to fraudulently obtain PPP loans for clients and others in exchange for approximately $4,000 per successful application. As detailed in the PSR, the defendant recruited his mother (Johnson) and cousin (McKenzie) to be intermediaries and find clients for the defendant. (*See id.* ¶¶ 46-49). In total, over approximately two years, the defendant provided false documentation to accompany online PPP loan applications to more than 65 people. (*Id.* ¶ 20). The

3

known loss to the SBA and taxpayers caused by the defendant's fraudulent acquisition of the forgiven PPP loans is $303,138 (reflected as the restitution amount in the plea agreement and PSR). The total intended harm caused by the defendant (as measured by PPP loans either not granted, forgiven, or of which the status is uncertain) is nearly $3 million. (*See id.* ¶¶ 55-56).

### D. Procedural History

On February 18, 2026, the defendant pled guilty before Chief Magistrate Judge Vera M. Scanlon to Count 2 of a six-count Indictment, charging Bolden with conspiracy to commit wire fraud in connection to a presidentially declared emergency under Section 501 of the Stafford Act, in violation of 18 U.S.C. § 1349. (*Id.* ¶¶ 1-2). The Court accepted the defendant's guilty plea on April 15, 2026. (ECF No. 110).

## II.   Guidelines Calculation

The following Guidelines range, as reflected in the plea agreement, should apply:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus: Loss Exceeding $1,500,000 (§ 2B1.1(b)(1)(I)) | +16 |
| Plus: Fraud in Connection with Major Disaster or Emergency Benefits (§ 2B1.1(b)(12)) | +2 |
| Plus: Aggravated Role Adjustment (§ 3B1.1(b)) | +3 |
| Minus: Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total: | 25 |

(PSR ¶¶ 64-74). Based on a Criminal History Category of I, the Sentencing Guidelines calculate a range of imprisonment of 57 to 71 months' custody. (*Id.* ¶ 105). However, as described in paragraphs 2 and 14 of the defendant's plea agreement, the government agreed to recommend a downward variance of six to eight months if all three defendants pleaded guilty. Therefore, the government recommends a custodial sentence of 51 to 63 months.

## III.   A Custodial Sentence of 51 to 63 Months is Warranted

### A. Legal Standard

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).

4

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, § 3553(a) provides that, in imposing a sentence, a court shall consider:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; [and]

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

B.  Section 3553(a) Factors

The government respectfully submits that a sentence between 51 – 63 months is sufficient but not greater than necessary to achieve the goals of sentencing.

The defendant's crime was serious. The PPP was a critical piece of the government's response to an unprecedented emergency, a worldwide pandemic that shuttered society. Billions in taxpayer dollars were rushed to American businesses so that they could stay afloat and keep workers employed. The defendant took advantage of this emergency and sought to steal nearly $3,000,000 from the program, and succeeded in stealing at least several hundred thousand. The program's resources were finite—only a certain amount of money was allocated to the PPP. Money fraudulently acquired by the defendant and his co-conspirators meant money not

going to a business that truly needed it. While defrauding any government program is wrong, it is particularly egregious to steal emergency funds during a national disaster.

The defendant argues that his criminal conduct was due to a "lapse in judgment." (ECF 113 at 3). However, unlike his co-defendant Carreira, who submitted a small number of fraudulent applications, the defendant here helped orchestrate the submission of numerous fraudulent applications over years. Nor did the defendant just submit his own fraudulent application; he built an entire business around the fraudulent conduct. In the process, he corrupted fellow NYPD officers and family members, including his own mother. This was not merely a lapse in judgment, but rather a long-running, calculated scheme organized, in part, by the defendant. Still, the government credits the defendant's submission, in which he accepts responsibility for his conduct and does not seek to justify it or downplay its seriousness.

The defendant's individual characteristics also warrant a custodial sentence between 51 – 63 months. That the defendant had sworn to uphold the law as an NYPD detective is an aggravating rather than mitigating factor for sentencing. While the criminal conduct was unrelated to his work as a detective, society's faith in their public officials is seriously undermined when those officials break the law they swore to uphold. Additionally, the defendant did not only tarnish his own career and reputation, but he corrupted multiple members of the NYPD.

General deterrence also supports the government's recommended sentence. As previously stated, the defendant defrauded a program meant to help Americans during a time of crisis. These crimes steal money from the American taxpayer, leave less money available to those who it is meant to assist, and weaken Americans' faith in important government programs at a time when the public is dependent on government assistance and information. It also undermines the public's faith in such programs when the next crisis strikes, as they are potentially less likely to support necessary aid to struggling Americans when they believe individuals like the defendant will steal large portions of the funds. A serious custodial sentence would send the necessary message that taking advantage of national emergencies will result in severe punishment if caught.

C. Home Confinement, Restitution, and Forfeiture

The government respectfully submits that in light of the defendant's conduct, home confinement would be a wholly inappropriate alternative to incarceration. While the Court will of course consider mitigating factors in fashioning the appropriate sentence, the defendant's avoidance of any serious prison time is not justified in this case.

Additionally, as agreed to in the plea agreement, the government respectfully requests that the Court order the defendant to pay $303,138 in restitution to the SBA, and $112,002 in criminal forfeiture.

IV.     Conclusion

        For the foregoing reasons, the government respectfully requests that the Court impose a custodial sentence of 51 – 63 months.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:     /s/ Andrew D. Grubin
Andrew D. Grubin
Eric W. Silverberg
Assistant U.S. Attorneys
718-254-7000

cc:     Clerk of the Court (DG) (by ECF)
        All Counsel of Record (by ECF)
        Samirah Nizam-Poon, United States Probation Officer (by E-mail)